## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MUSÉE DU LOUVRE,<br><br>                    Plaintiff,<br>     v.<br><br>SEE GLOBAL ATTRACTIONS, INC.; and<br>SEE GLOBAL ENTERTAINMENT, INC.,<br><br>                    Defendants. | No. 22-cv-6733<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Musée du Louvre (the "Louvre"), by its attorneys MoloLamken LLP, brings this Complaint against Defendants SEE Global Attractions, Inc. and SEE Global Entertainment, Inc. (together, "SEE Global"), alleging as follows:

## NATURE OF THE ACTION

1.      This is an action to halt SEE Global's continued misappropriation of the Louvre's reputation and intellectual property through a venture called "Louvre Fantastique."

2.      The Louvre is the largest, best-known, and most-visited art museum in the world. In 2019 alone, it had 9.6 million visitors, including more than 1.5 million from the United States. During more than 200 years of existence, the Louvre has amassed a collection of some of the most famous art in the world, including the Mona Lisa and the Venus de Milo.

3.      The Louvre is known not just for its art, but also for its iconic setting – a sprawling, 800-year-old palace in the heart of Paris. Designed by several generations of architects in several different styles, the palace comprises three main wings – each marked by tall, ornate "*pavilions*" – surrounding an expansive central courtyard. In the middle of the courtyard is another visual icon: a 70-foot-high pyramid of interlocking, diamond- and triangular-shaped glass panes (the

"Pyramid"), which has served as the main entrance to the Louvre since 1989. Designed by Chinese-American architect I. M. Pei, the Pyramid is famous in its own right. In 2017, the Pyramid received The American Institute of Architects' prestigious 25 Year Award. The AIA has described the Pyramid as "rival[ing] the Eiffel Tower as one of France's most recognizable architectural icons."

4.     The word "Louvre" is unique, and its origins are unknown. In American English and in French, the word "Louvre" refers only to the museum in Paris. In a crowded marketplace for museum goods and services, the Louvre's distinctive name, the palace, and the Pyramid serve to designate products and services affiliated with the Louvre.

5.     The Louvre has a sterling reputation. It is highly regarded for the quality of its collection, its contribution to society, and its leadership in the museum world. A 2017 study by the Rotterdam School of Management at Erasmus University, which surveyed nearly 12,000 people in 10 countries around the world, found that, of the 18 most famous art museums in the world, the Louvre enjoyed the strongest reputation. The perception of the Louvre "is consistent all over the world"; it is the "absolute leader." The study found that the Louvre had an overall reputation that the "most reputed companies in the world can only dream about." In addition to its universal appeal, more people were familiar with the Louvre than any other museum, "by far."

6.     "Louvre Fantastique" is SEE Global's blatant attempt to exploit that hard-earned reputation for its own profit. SEE Global recently opened Louvre Fantastique, an exhibition that displays dozens of "interactive" reproductions of art from the Louvre, at the Oakbrook Center mall in Oak Brook, Illinois, a suburb of Chicago. After that show closed, SEE Global opened Louvre Fantastique at the Mall of America near Minneapolis, Minnesota.

7.     In marketing the exhibition – including through its website, mobile app, and social

media pages – SEE Global has transparently ripped off the Louvre's trademarks – including its name and visual iconography – and copyright-protected media to create the appearance that Louvre Fantastique is affiliated with or approved by the Louvre. It is not. SEE Global did not request the Louvre's permission to use its name or other intellectual property in advance of launching Louvre Fantastique – and it has never received such permission.

8. SEE Global's infringement has been willful. The Louvre sent SEE Global a cease-and-desist letter before the Oak Brook mall show opened, explaining that SEE Global's announced exhibition and advertisements infringed the Louvre's trademarks and copyrighted material. SEE Global, puzzlingly, responded by claiming that it *"came up with its pyramid using its own creativity"* (emphasis added). It otherwise offered tepid denials of the Louvre's allegations.

9. SEE Global has already caused harm in several ways. It has infringed the Louvre's registered and unregistered trademarks, and its copyright-protected materials. It has also damaged the Louvre's reputation and threatened to confuse consumers. And it appears intent on continuing its harmful behavior. Although SEE Global closed the Oak Brook mall location in September, it opened another Louvre Fantastique exhibition in Minnesota's Mall of America in November.

10. The Louvre therefore brings this action to recover damages for injuries SEE Global has caused through Louvre Fantastique, and to enjoin SEE Global from continuing to confuse consumers and unfairly exploit the Louvre's reputation and intellectual property for its own profit.

## PARTIES

11. The Louvre is a public administrative establishment formed under the laws of France. It is a citizen of France.

12. Defendant SEE Global Attractions, Inc. is a Nevada corporation. On information and belief, SEE Global Attractions, Inc.'s principal place of business is in California.

13.   Defendant SEE Global Entertainment, Inc. is a Nevada corporation.   On information and belief, SEE Global Entertainment, Inc.'s principal place of business is in California.

## JURISDICTION AND VENUE

14.   This action arises under the federal Trademark Act, 15 U.S.C. §§ 1051 *et seq.*, federal Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and related state statutes.   This Court has subject-matter jurisdiction over this action under 15 U.S.C. § 1121(a), and 28 U.S.C. §§ 1331, 1332, 1338, and 1367(a).

15.   SEE Global is subject to personal jurisdiction in this district because SEE Global purposefully conducted business in this district by advertising and operating its "Louvre Fantastique" exhibition here for approximately 12 weeks, including by renting a space in the Oakbrook Center mall in Oak Brook, Illinois (on information and belief); operating the exhibition in that location; promoting the exhibition in Chicago-based or Chicago-directed media outlets; and offering TV interviews in the Oak Brook mall space.   SEE Global's conduct also harmed the Louvre in this district by infringing its copyright in this district, diluting its registered and unregistered trademarks in this district, and confusing consumers in this district about the source, origin, or sponsorship of Louvre Fantastique – namely, by misleading customers to believe that Louvre Fantastique is affiliated with, connected with, or approved by the Louvre.

16.   Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred here.   The Louvre Fantastique show operated in person in Oak Brook, Illinois, for approximately 12 weeks.   The Louvre Fantastique app was – and, as of today, remains – available for download in this district.

**FACTUAL ALLEGATIONS**

I.    THE MUSÉE DU LOUVRE

    A.    **The Louvre's History and Reputation**

17.    The Louvre opened in 1793.  It is the largest museum in the world.  For nine of the last 10 years, the Louvre has also been the most-visited museum in the world.  In 2019 alone, it welcomed 9.6 million visitors.  While the Louvre charges €17 (about $17) for a full-priced ticket, the museum offers free admission for many, including children, art teachers, journalists, and people with disabilities.

18.    The Louvre's home is an iconic palace in the heart of Paris, which stands along the right bank of the Seine.  The main entrance to the Louvre is through its expansive central courtyard.  The courtyard is surrounded by three main wings on the north, east, and south sides.  Rising above those wings are several tower-like structures known as *pavilions*.  Anchoring the courtyard is the 70-foot-tall Pyramid made of glass and steel.  Designed by famed architect I. M. Pei, the Pyramid is not just an impressive monument.  As the Louvre's main entrance, it also serves as an iconic portal into the museum's world-renowned collection of art and artifacts.

19.    That collection numbers more than 500,000 pieces.  The Louvre's holdings range from esteemed works by da Vinci and Rembrandt to priceless antiquities from Greece and Mesopotamia.  The museum houses the Venus de Milo, the Great Sphynx of Tanis, Code of Hammurabi, the Winged Victory of Samothrace, Death of the Virgin, Liberty Leading the People, and countless other world-famous items.  It is also the home of the Mona Lisa, perhaps its most widely known piece.  The Louvre is a quintessential "universal museum," containing works from around the globe.

20.    The Louvre also welcomes visitors from across the world.  And among those foreign visitors, visitors from the United States are the most numerous.  Recognizing this special

connection, the Louvre founded "American Friends of the Louvre," a U.S.-based charity aimed at strengthening ties between the Louvre and the American public by raising awareness of the Louvre's collections and making them more accessible throughout the country. American Friends of the Louvre hosts virtual and in-person events, including lectures, tours of art museums, and trips abroad.[1]

21. The Louvre also collaborates with other museums to bring its art to the United States. In the last 20 years, for example, the Louvre has organized ten joint exhibitions with American museums, including the Metropolitan Museum of Art in New York, the National Gallery of Art in Washington, D.C., and at least one with the Art Institute of Chicago. In the last ten years alone, the Louvre has loaned individual items to approximately 50 American museums, including the Chicago Art Institute (as recently as fall 2020) and the Minneapolis Institute of Art (last in 2017).

22. The Louvre and its art are frequently featured in American newspapers and magazine articles and have, for example, been mentioned in dozens of articles in last year in *The New York Times*. The Louvre has also been mentioned in at least a dozen articles in the *Chicago Tribune* and the *Chicago Sun-Times* since 2017. SEE Global itself refers to Louvre as "the iconic museum," and it refers to the reproductions it displays as coming from "the World's Most Famous Art Collection."

23. The Louvre reaches many consumers, including in Illinois and elsewhere in the United States, through its official website, available in English at www.louvre.fr/en. On the website, users can learn information about visiting the Louvre, search the museum's extensive digital catalog, and purchase Louvre-branded merchandise from its online boutique.

---

[1] *See* Am. Friends of the Louvre, https://aflouvre.org (last visited Nov. 30, 2022).

### B.    The Louvre's Intellectual Property

24.    The Louvre's distinctive name – which lacks any common meaning in American English or French – has come to signify the institution and its excellence as a custodian and sponsor of global art.  A recent study of 18 famous art museums around the world concluded that the Louvre had the single best reputation in terms of esteem, good feeling, trust, and admiration.  The Louvre was found to be "especially highly regarded for the quality of its collection, its contribution to society and its leadership in the museum world."  The researchers described its reputation as "an achievement that the most reputed companies in the world can only dream about."

25.    The Louvre protects its excellent reputation in a variety of ways.  First, it holds registered trademarks in both France and the United States, such as USPTO Reg. No. 1,680,251 ('251), which has been registered since 1992.  The Pyramid itself, a central component of its visual identity, is protected as an original work, and the Louvre holds all economic rights to the Pyramid.  And the Louvre's website provides clear notice that its contents – including trademarks, logos, photographs, and audiovisual materials – are subject to intellectual property protections.

26.    Among the materials on the Louvre's website is a video montage that appears on the homepage, www.louvre.fr/en (the "Louvre Website Video").  The Louvre Website Video consists of five short looping clips: two exterior shots of the Louvre and the Pyramid, one shot of the Louvre's famous Grande Galerie, one shot of the Venus de Milo, and one shot of the Mona Lisa.  Each clip lasts approximately four seconds.

27.    The footage in the Louvre Website Video was co-produced by the Louvre and the Japanese public broadcaster Nippon Hōsō Kyōkai ("NHK").  The production of the footage, which was shot in 8K resolution, was a significant undertaking that took place over several days of shooting and required the Louvre to grant NHK special access to the museum.  Under contracts

entered in 2016 and 2017, the Louvre has the rights to use the co-produced images in audiovisual or cinematographic material on its website.

28.     The Louvre Website Video has appeared on the homepage of the Louvre's website since March 2021.  It provides a visually compelling introduction to the museum and highlights two of the most significant works in its vast collection for visitors to the Louvre's website.

29.     The Louvre selects its partners with care and allows the use of its name only sparingly.  In 2017, the museum collaborated with the United Arab Emirates in opening the "Louvre Abu Dhabi," considered France's largest cultural project abroad.  The UAE paid over $500 million for the right to use the "Louvre" name.[2]  More recently, the Louvre has entered into licensing agreements with a select number of retailers, including Uniqlo, that sell merchandise branded with its famous name and iconic works.  And the Pyramid has been featured prominently in at least one hundred films, including many recent multi-million-dollar films like *Wonder Woman*, *The Da Vinci Code*, *Midnight in Paris*, and in popular TV shows like *Lupin* and *Emily in Paris*.[3]  In each of these cases, filmmakers paid considerable sums to use images of the Pyramid and the Louvre's building.

30.     The Louvre's efforts help ensure that its name and image are recognized by the consuming public – in Illinois, in Minnesota, throughout the United States, and across the world – as designating products and services affiliated with the Louvre and its exceptional brand.

---

[2] The agreement between the governments of France and the United Arab Emirates is available at the following link: https://www.legifrance.gouv.fr/jorf/id/JORFTEXT000019417311.

[3] The Louvre was also featured in the music video for "Apeshit" by The Carters – the musical duo Beyoncé and Jay-Z.  *See* "THE CARTERS - APESHIT (Official Video)," YouTube.com (Jun. 16, 2018), https://www.youtube.com/watch?v=kbMqWXnpXcA.

II.     SEE GLOBAL AND "LOUVRE FANTASTIQUE" RIP OFF THE LOUVRE'S REPUTATION

        A.      SEE Global Steals The Louvre's Intellectual Property To Attract Customers

        31.     SEE Global is a "themed entertainment" business.  It purports to offer customers "immersive" experiences with both physical and virtual components.  SEE Global's past projects have ranged widely in focus, from *Star Trek* and *I Love Lucy* to "failed products" and "disgusting food."

        32.     "Louvre Fantastique," one of SEE Global's current ventures, is an art-themed experience that displays reproductions of items from the Louvre's famous collection.  The exhibition's website, www.louvrefantastique.com, promises that visitors will "SEE THE TREASURES OF THE LOUVRE COME TO LIFE!"   A promotional video on the homepage pans through the exhibition, which shows reproductions of paintings and sculpture displayed in a large room.  In the video, a visitor attaches arms to an imitation Venus de Milo.  Another visitor stands in front of a "moving picture" version of the Mona Lisa on a screen.  Other attendees walk through a replica of the Louvre's Pyramid.

        33.     The Louvre Fantastique logo, shown below, depicts the Pyramid set in front of one of the museum's wings, with a *pavilion* visible behind the Pyramid.  The logo's text uses a small caps serif font that emulates the style of the "Louvre" name on the museum's official website.



| Official Louvre Logos | Louvre Fantastique Logo |
|---|---|
| [Front from Louvre website] | |
| ['251 trademark] | |

34.     In addition to appropriating the Louvre's name, the Louvre Fantastique venture relies heavily on the visual iconography of the Louvre palace and the Pyramid.  In the Louvre Fantastique logo, the Pyramid – with its distinctive diamond- and triangular-shaped panes of glass visible – stands in front of one of the Louvre's wings, with a *pavilion* rising prominently above it.

| Photograph of the Louvre | Image Portion of Louvre Fantastique Logo (as appears on website, Facebook, and Instagram) |
|---|---|

| Photograph of the Louvre | Image Portion of Louvre Fantastique Logo (as appears in app) |
|---|---|
|  |  |

**B.  SEE Global Launches "Louvre Fantastique" in a Suburban Mall**

35.  Louvre Fantastique first opened in July 2022 in the Oakbrook Center mall in Oak, Brook, Illinois.  It ran in that location for approximately twelve weeks, until October 9, 2022. Tickets started at around $20 – more than the current price of admission to the Louvre itself – and "VIP" tickets were available for an additional premium.

36.  SEE Global promoted the Oak Brook mall show on social media, including on Facebook and Instagram.  Louvre Fantastique's Facebook and Instagram profiles use the same logo as the Louvre Fantastique website.  Those profiles list Louvre Fantastique as an "Art Museum."  Louvre Fantastique's Instagram posts use tags like "#chicagoart"; "#chicagoartinstitute"; and "#louvrechicago."  Some posts, such as an Instagram post dated June 7, 2022, include such tags as "#louvremuseum"; "#lelouvre"; and "#thelouvremuseum"; along with "#louvrechicago." In many of the social media posts promoting Louvre Fantastique (including the June 7, 2022 Instagram post), SEE Global uses the symbol for unregistered trademarks (TM) when referring to the Louvre:



37.    The Oak Brook mall show also received significant attention in the Chicago-area media.  One promotional piece proclaimed that readers had "[n]o need to pack [their] bags for France," because they "can see the Louvre's most priceless pieces right here in Chicago!"  Several local news outlets ran segments on the exhibition, including, for example, WGN on July 14, 2022, and ABC on August 31, 2022.  SEE Global reposted at least one of those television news clips on the Louvre Fantastique Facebook page.

38.    Other coverage was less positive.  One reviewer described the exhibition as "not high quality," noting that "[s]everal of the interactive displays . . . were broken."  Another complained that the ticket price was "totally unjustifiable." A third characterized Louvre Fantastique as a shoddy "mall experience."

39.    The Oak Brook mall show included a gift shop, where visitors could purchase unauthorized merchandise branded with the Louvre's name and artwork.  SEE Global promoted

that gift shop and unauthorized merchandise on social media:



### C. The Louvre Fantastique App

40.     SEE Global promotes a smartphone app as a companion to the Louvre Fantastique show.  The Louvre Fantastique app is available for download through Google Play and Apple's App Store.  According to its pages on these platforms, the Louvre Fantastique app has been available to download for more than four months.

41.     The homepage of the Louvre Fantastique app contains a variation of the "Louvre Fantastique" logo shown above.  It also contains a looping montage video with five different short video clips: two exterior shots of the Louvre and the Pyramid, one shot of the Louvre's famous Grande Galerie, one shot of the Venus de Milo, and one shot of the Mona Lisa (the "Louvre Fantastique App Video").  Each clip in the Louvre Fantastique App Video lasts approximately four seconds.

42.     Other than adjusting the color and cropping it to fit a vertically oriented screen, SEE Global apparently lifted this video shot-for-shot from the Louvre Website Video.

13

43.    The following are screenshots taken from the Louvre Fantastique App Video and the Louvre Website Video:





| Louvre Website Video | Louvre Fantastique App Video |
|---|---|
|  |  |
|  |  |
|  |  |

44.     SEE Global sought no permission for this shameless copying, and the Louvre has never authorized it or received any compensation from SEE Global for its use.  The app does not provide an attribution of the true source of the Louvre Website Video.  Instead, outrageously, the Louvre Fantastique page on Apple's App Store claims copyright over the app – including the Louvre Website Video stolen from the Louvre's homepage – in the name of SEE Global Entertainment.

**D.      SEE Global's Willfulness**

45.     In February 2022, several months before the Oak Brook mall show opened, SEE Global filed a trademark application with the U.S. Patent and Trademark Office, seeking registration of the mark "SEE's Louvre Fantastique."

46.     Counsel for the Louvre contacted SEE Global's trademark counsel in July 2022, noting that SEE Global's venture, which by that point had a public website, threatened to infringe the Louvre's marks.  The Louvre's letter noted, among other things, that "Louvre Fantastique" impermissibly used the name "Louvre," in a "font very similar" to that of the Louvre.

47.     In that July 2022 letter, the Louvre emphasized that it was in "no way" interested in any "partnership and/or collaboration" with SEE Global.  It demanded that SEE Global withdraw its trademark application, deactivate its website, and "cease all use of any distinctive sign, trademark, logo, font and domain name used by the Louvre Museum in the context of its commercial activity."

48.     SEE Global's response demonstrated its willfulness and bad faith.  In denying that its trademark application and use of its mark infringed the Louvre's marks, SEE Global claimed that it ***"came up with its pyramid using its own creativity"*** (emphasis added), and that its pyramid logo was therefore an "original creation."  It also asserted ***"there are only a limited number of***

*ways that a pyramid can be depicted"* (emphasis added). The letter nowhere acknowledged, let alone addressed, the fact that a Louvre wing and pavilion – a feature most certainly not the result of SEE Global's "own creativity" – was an integral part of its logo and marketing.

49.     SEE Global's response also made clear that it had no intention to curtail its misappropriation of the Louvre's intellectual property and associated goodwill. Indeed, SEE Global stated that, even if the U.S. Patent and Trademark Office refused its trademark application, SEE would "continue to use its SEE LOUVRE FANTASTIQUE mark, and/or use the term Louvre in a factual sense such as by informing the public that SEE's exhibition features displays and renditions of works of art" found in the Louvre.

50.     SEE Global accordingly continued with its apparent plans for Louvre Fantastique: selling tickets for and operating the Oak Brook mall show and affiliated gift shop, releasing the companion app, and undertaking various promotional efforts to draw attention to the venture.

51.     The Louvre Fantastique venture, as eventually realized, was even more audacious than the Louvre had feared at the time of its July letter. Although SEE Global had sought registration of the trademark "SEE's Louvre Fantastique," the vast majority of marketing materials referred only to "Louvre Fantastique," further blurring the distinction between the Louvre Fantastique and the Louvre.

**E.     SEE Global Announces Mall of America Exhibition**

52.     On November 18, 2022, SEE Global reopened the Louvre Fantastique exhibition in the Mall of America near Minneapolis, Minnesota.

53.     According to the Louvre Fantastique website, a standard adult ticket to the Minneapolis exhibition starts at more than $28 before taxes, depending on the time slot. A "VIP" adult ticket – which gives the visitor "skip-the-line access and an exclusive souvenir poster" –

starts around $45.

54. The ticketing webpage for the Louvre Fantastique's Mall of America show, which became accessible to the public around early November 2022 and is available today, uses the symbol for unregistered trademarks (™) to assert its trademark rights over the name "Louvre" – promising visitors "over 100 masterpieces from the Louvre's™ priceless collection" as well as the "magic of the Louvre™ and its timeless art":



## F. Harm to the Louvre

55. Based on SEE Global's marketing and presentation of the Louvre Fantastique exhibition and app, consumers have likely assumed, and will likely continue to assume, that Louvre Fantastique is affiliated with or approved by the Louvre. That is the inevitable consequence of SEE Global's use of the Louvre's distinctive name, paired with another French word; its use of a font similar to the font used on the Louvre's official materials and website; its

use of a logo containing the Louvre's iconic Pyramid; its explicit use of art held by the Louvre; and its blatant copying of copyright-protected video footage that plays on the homepage of the Louvre's official website – all to sell tickets to its art exhibition. After all, the Louvre itself is primarily in the business of showcasing art – the very same art displayed in Louvre Fantastique. SEE Global's exploitation of the Louvre's registered and unregistered trademarks, name, and image thus badly damages the Louvre's valuable reputation by falsely associating the Louvre with the Louvre Fantastique exhibition's shoddy, low-budget presentation of those works.

56.     SEE Global's marketing and presentation of the Louvre Fantastique exhibition and app have also harmed the Louvre by blurring the Louvre's registered and unregistered marks. SEE Global's incorporation of the Louvre's famous mark in "Louvre Fantastique" creates an association that reduces consumer perception of the Louvre's famous mark as a unique mark, and thus impairs its distinctiveness. SEE Global's actions also blur the Louvre's strong mark by using the name to refer vaguely to the art contained inside the Louvre rather than to the institution itself. That blurring risks diminishing the sterling reputation the Louvre has developed as a museum, known not just for its incredible art, but also for its contributions to society and its leadership in the museum world.

57.     SEE Global's marketing and presentation of the Louvre Fantastique exhibition and app have also harmed the Louvre by causing dilution by tarnishment of the Louvre's registered and unregistered marks. Those marks are both famous and strongly associated with the Louvre's reputation as a world-renowned, first-class art museum. SEE Global's unauthorized use – to promote a gimmicky "mall experience" – harms the reputation of the Louvre's marks.

58.     The Louvre has also lost potential income in the form of licensed merchandise and other business. As set forth above, retailers and other partners pay significant sums of money to

use the Louvre's name. By hawking tickets to a "themed experience" and selling unauthorized merchandise from its gift shop, SEE Global has stolen away sales from the Louvre and its official partners.

59.     Absent an injunction, the Louvre will suffer future harm in both Illinois and Minnesota in the form of continued harm to its goodwill and reputation as a world-class museum, continued dilution of its marks by blurring and tarnishment, and continued lost profits from SEE Global's unauthorized use of its marks and reputation, and sales of unauthorized merchandise.

60.     Consumers too have been, and will continue to be, harmed by SEE Global's actions. SEE Global misled consumers by implying that its exhibit was affiliated with the renowned museum. Having paid top dollar expecting to experience the wonders of the world's most famous museum, many will leave disappointed by SEE Global's low-budget gimmick.

**<u>COUNT ONE</u>**
**Federal Trademark Infringement**
**(15 U.S.C. § 1114)**

61.     All foregoing paragraphs are incorporated herein by reference.

62.     The Louvre holds USPTO registered trademark number 1,680,251.

63.     The Louvre's '251 mark is federally protectable because it is capable of distinguishing the Louvre's goods and services from those of others. The '251 mark comprises the inherently distinctive word "Louvre," which has no common usage in American English or in French other than to refer to the Louvre. The mark is arbitrary or fanciful with respect to the nature of the goods and services offered by the Louvre.

64.     SEE Global knows that "Louvre" is a protectable mark because it uses the unregistered trademark symbol (TM) on its website for that mark.

65.     The "Louvre" mark is famous in the United States, including in Illinois and

Minnesota.

66.     The Louvre uses the '251 mark in commerce in connection with the distribution, sale, offering for sale, or advertising of goods across the United States, including in Illinois and Minnesota, through, *inter alia*, the Louvre's official website, its online boutique, its collaborations with licensed retailers like Uniqlo, and its collaborations with or the loan of art to U.S. art museums.

67.     Without any consent from the Louvre, SEE Global has willfully used various reproductions, copies, or colorable imitations of the Louvre's '251 mark in its logos and marketing for the Louvre Fantastique venture.  These reproductions, copies, or colorable imitations are likely to cause – and SEE Global intends them to cause – confusion, mistake, or deception among consumers as to the source, origin, or sponsorship of the Louvre Fantastique venture, and to mislead consumers into believing that the goods and services of the Louvre Fantastique venture originate from, are affiliated with, are connected with, or are approved by the Louvre.

68.     The Louvre Fantastique exhibition and the Louvre's exhibits, merchandise, and other commerce are of the kind the public might very well attribute to a single source.

69.     SEE Global and the Louvre use the same channels of commerce and target the same general audience – art lovers and those wishing to enjoy the world's finest art collection.

70.     The Louvre offers its museum services to the public at large – and offers them at prices affordable to the general public, rather than only to sophisticated consumers.  And because the Louvre and its marks are so distinctive – referring only to the museum – consumers are more likely to rely on the "Louvre" name without further investigation.

71.     SEE Global had notice of the Louvre's '251 mark at the time of its unlawful and improper actions.  SEE Global acted willfully and in bad faith, making no meaningful attempt to

disclaim any relationship between the Louvre Fantastique exhibition and the Louvre. SEE Global acted with the intent to trade on the goodwill associated with the "Louvre" mark and to cause substantial and irreparable injury to the Louvre.

72. Accordingly, SEE Global's actions constitute trademark infringement in violation of 15 U.S.C. § 1114.

73. SEE Global has profited from these acts of infringement, which have caused the Louvre to sustain monetary damage, loss, and injury in an amount to be determined at trial.

74. SEE Global's actions have caused substantial and irreparable damage and injury to the Louvre, in particular to its valuable goodwill and the distinctive quality of its name, and, unless enjoined by this Court, will continue to cause substantial and irreparable damage and injury to the Louvre for which the Louvre has no adequate remedy at law.

**COUNT TWO**
**Federal False Designation of Origin**
**(15 U.S.C. § 1125(a))**

75. All foregoing paragraphs are incorporated herein by reference.

76. The Louvre's name is a federally protectable mark because it is capable of distinguishing the Louvre's goods and services from those of others. The word "Louvre" is inherently distinctive. It has no common usage in American English or in French other than to refer to the Louvre. The mark is arbitrary or fanciful with respect to the nature of the goods and services offered by the Louvre.

77. The Louvre's name is a distinctive and famous mark because it is widely recognized by the consuming public of the United States, including in Illinois and Minnesota, as a designation of the source of the goods and services of the Louvre, specifically the museum or the palace complex in which the museum resides, and with the Louvre's art, exhibits, and merchandise.

78.     The Louvre uses its mark in commerce in connection with the distribution, sale, offering for sale, or advertising of goods across the United States, including in Illinois and Minnesota, through, *inter alia*, the Louvre's official website, its online boutique, its collaborations with licensed retailers, and its collaborations with or the loan of art to U.S. art museums.

79.      Without any consent from the Louvre, SEE Global has willfully used various reproductions, copies, or colorable imitations of the Louvre's name in relation to the Louvre Fantastique venture.  These reproductions, copies, or colorable imitations are likely to cause confusion, mistake, or deception among consumers as to the source, origin, or sponsorship of the Louvre Fantastique venture, and to falsely mislead consumers into believing that the goods and services of the Louvre Fantastique venture originate from, are affiliated with, are connected with, or are approved by the Louvre.

80.     The Louvre Fantastique exhibition and the Louvre's exhibits, merchandise, and other commerce are of the kind the public might very well attribute to a single source.

81.     SEE Global and the Louvre use the same channels of commerce and target the same general audience – art lovers and those wishing to enjoy the world's finest art collection.

82.     The Louvre offers its museum services to the public at large – and offers them at prices affordable to the general public, rather than only to sophisticated consumers.  And because the Louvre and its marks are so distinctive – referring only to the museum – consumers are more likely to rely on the "Louvre" name without further investigation.

83.     SEE Global had notice of the Louvre's mark at the time of its unlawful and improper actions.  SEE Global acted willfully and in bad faith, making no meaningful attempt to disclaim any relationship between the Louvre Fantastique exhibition and the Louvre.  SEE Global acted with the intent to trade on the goodwill associated with the "Louvre" mark and to cause

substantial and irreparable injury to the Louvre.

84.     Accordingly, SEE Global's actions constitute false designation of origin in violation of 15 U.S.C. § 1125(a).

85.     SEE Global profited from these acts of false designation, which have caused the Louvre to sustain monetary damage, loss, and injury in an amount to be determined at trial.

86.     SEE Global's actions have caused substantial and irreparable damage and injury to the Louvre, in particular to its valuable goodwill and the distinctive quality of its name, and, unless enjoined by this Court, will continue to cause substantial and irreparable damage and injury to the Louvre for which the Louvre has no adequate remedy at law.

**COUNT THREE**
**Federal Trademark Dilution**
**(15 U.S.C. § 1125(c))**

87.     All foregoing paragraphs are incorporated herein by reference.

88.     The Louvre's name is a distinctive and famous mark because it is widely recognized by the consuming public of the United States, including in Illinois and Minnesota, as a designation of the source of the goods and services of the Louvre, specifically the museum or the palace complex in which the museum resides, and with the Louvre's art, exhibits, and merchandise.

89.     The Louvre protects its name to ensure that "Louvre" remains a byword for excellence in museum services.  The Louvre's name is used exclusively by the Louvre or by approved licensees (for example, Louvre Abu Dhabi).

90.     Through its Louvre Fantastique venture, SEE Global has made and continues to make commercial use of the Louvre's name in commerce.

91.     SEE Global took these actions in 2022, long after the Louvre's name had become a famous mark.

92.     SEE Global's use of the Louvre's name has actually diluted the Louvre mark – impairing its distinctiveness and harming its reputation – by associating the Louvre with a low-quality, overpriced exhibit.

93.     SEE Global intended to create – and did create – an association between the Louvre Fantastique exhibition and the Louvre by incorporating "Louvre" into the name, and by using another French word as part of the name, and thus acted willfully in trading on the recognition of the Louvre's famous mark for its own commercial gain.

94.     SEE Global has profited from these acts of dilution, which have caused the Louvre to sustain monetary damage, loss, and injury in an amount to be determined at trial.

95.     SEE Global's actions have caused substantial and irreparable damage and injury to the Louvre, in particular to its valuable goodwill and the distinctive quality of its name through damage to its nationwide reputation, and, unless enjoined by this Court, will continue to cause substantial and irreparable damage and injury to the Louvre for which the Louvre has no adequate remedy at law.

## COUNT FOUR
### Domain Name Trademark Infringement
### (15 U.S.C. § 1125(d))

96.     All foregoing paragraphs are incorporated herein by reference.

97.     The Louvre's name is a distinctive and famous mark that the Louvre has possessed since before 2022.

98.     On information and belief, SEE Global registered the domain name www.louvrefantastique.com in February 2022.

99.     The domain name www.louvrefantastique.com is confusingly similar to the Louvre's distinctive and famous mark, the name "Louvre."

100.     SEE Global had a bad-faith intention to profit from its use of the domain name www.louvrefantastique.com.

101.     SEE Global lacks any intellectual property rights in the domain name www.louvrefantastique.com.  SEE Global's trademark application currently pending in the U.S. Patent and Trademark Office is for the mark "SEE's Louvre Fantastique," not "Louvre Fantastique."

102.     The domain name www.louvrefantastique.com contains the entirety of the Louvre's distinctive and famous mark, the name "Louvre."

103.     SEE Global lacks any bona fide noncommercial or fair use in registering and using the domain name www.louvrefantastique.com.

104.     SEE Global has profited from its willful and bad-faith use of the domain name www.louvrefantastique.com, which has caused the Louvre to sustain monetary damage, loss, and injury in an amount to be determined at trial.

105.     SEE Global's actions have caused substantial and irreparable damage and injury to the Louvre, in particular to its valuable goodwill and the distinctive quality of its name, and, unless enjoined by this Court, will continue to cause substantial and irreparable damage and injury to the Louvre for which the Louvre has no adequate remedy at law.

### COUNT FIVE
### Illinois Consumer Fraud and Deceptive Practices Act – Damages
### (815 ILCS 505)

106.     All foregoing paragraphs are incorporated herein by reference.

107.     SEE Global has willfully engaged in deceptive or unfair trade practices.  Through its marketing of the Louvre Fantastique venture – including but not limited to the unauthorized use of (a) the term "Louvre," (b) the symbol for unregistered trademarks ($^{TM}$), (c) a font similar to the

one used on the Louvre's official materials and website, (d) the image of the Pyramid in its logo, and (e) video copied from the Louvre's website – SEE Global has passed off the goods and services of SEE Global as those of the Louvre; caused confusion or misunderstanding among consumers as to the source, sponsorship, approval, or certification of the goods or services of SEE Global; and caused confusion or misunderstanding among consumers as to the Louvre's affiliation, connection, association with, or certification of the Louvre Fantastique venture.

108.    SEE Global has deceived consumers, among other ways, through its use of the symbol for unregistered trademarks ($^{TM}$).  For example, the ticketing webpage for the Louvre Fantastique Mall of America show, which became accessible to the public around early November 2022 and is available today, promises visitors "over 100 masterpieces from the Louvre's$^{TM}$ priceless collection" as well as the "magic of the Louvre$^{TM}$ and its timeless art."  Those symbols are likely to cause confusion or misunderstanding among consumers as to the source, sponsorship, approval, or certification of Louvre Fantastique – particularly given that a consumer sees the symbols while purchasing, or considering whether to purchase, a ticket to Louvre Fantastique.

109.    SEE Global has also deceived consumers through its social media posts.  For example, in an Instagram post by the Louvre Fantastique account dated June 7, 2022, SEE Global stated that visitors could "[s]ee the artistic treasures *of the Louvre*$^{TM}$ at a 360º exhibit in Chicagoland" (emphasis added).   In that same post, SEE Global included the tags "#louvremuseum"; "#lelouvre"; "#thelouvremuseum"; and "#louvrechicago." These tags, symbols, and references to the Louvre's collection are likely to cause confusion or misunderstanding among consumers as to the source, sponsorship, approval, or certification of Louvre Fantastique.  SEE Global intended for consumers to rely on these unfair or deceptive practices.

110.    SEE Global's actions occurred during a course of conduct involving trade or

commerce in Illinois.

111.    SEE Global's actions are immoral, unethical, oppressive, and unscrupulous; offend public policy; and cause substantial injury to consumers.

112.    The Louvre has suffered actual damage as a result of SEE Global's unfair or deceptive practices, including in the form of reputational harm, lost sales and licensing opportunity, lost goodwill, and trademark dilution.

113.    But for SEE Global's actions, the Louvre, and consumers to whom Louvre Fantastique was marketed, would not have been injured.

**COUNT SIX**
**Illinois Uniform Deceptive Trade Practices Act – Injunctive Relief**
**(815 ILCS 510)**

114.    All foregoing paragraphs are incorporated herein by reference.

115.    SEE Global has willfully engaged in deceptive or unfair trade practices.  Through its marketing of the Louvre Fantastique venture, SEE Global has willfully passed off the goods and services of SEE Global as those of the Louvre; caused confusion or misunderstanding among consumers as to the source, sponsorship, approval, or certification of the goods or services of SEE Global; and caused confusion or misunderstanding among consumers as to the Louvre's affiliation, connection, association with, or certification of the Louvre Fantastique venture.

116.    SEE Global has deceived consumers, among other ways, through its use of the symbol for unregistered trademarks ($^{TM}$).  For example, the ticketing webpage for the Louvre Fantastique Mall of America show, which became accessible to the public around early November 2022, promises visitors "over 100 masterpieces from the Louvre's$^{TM}$ priceless collection" as well as the "magic of the Louvre$^{TM}$ and its timeless art."  Those symbols are likely to cause confusion or misunderstanding among consumers as to the source, sponsorship, approval, or certification of

Louvre Fantastique – particularly given that a consumer sees the symbols while purchasing, or considering whether to purchase, a ticket to Louvre Fantastique.

117. SEE Global has also deceived consumers through its social media posts. For example, in an Instagram post by the Louvre Fantastique account dated June 7, 2022, SEE Global stated that visitors could "[s]ee the artistic treasures *of the Louvre*™ at a 360º exhibit in Chicagoland" (emphasis added). In that same post, SEE Global included the tags "#louvremuseum"; "#lelouvre"; "#thelouvremuseum"; and "#louvrechicago." These tags, symbols, and references to the Louvre's collection are likely to cause confusion or misunderstanding among consumers as to the source, sponsorship, approval, or certification of Louvre Fantastique.

118. SEE Global intended for consumers to rely on these unfair or deceptive practices.

119. SEE Global's actions occurred during a course of conduct involving trade or commerce in Illinois.

120. SEE Global's actions are immoral, unethical, oppressive, and unscrupulous; offend public policy; and cause substantial injury to consumers.

121. But for SEE Global's actions, the Louvre, and consumers to which Louvre Fantastique was marketed, would not have been injured.

122. Absent an injunction, the Louvre is likely to suffer future harm, both in Illinois and Minnesota, from SEE Global's unfair or deceptive practices.

## COUNT SEVEN
### Common Law Trademark Infringement

123. All foregoing paragraphs are incorporated herein by reference.

124. The Louvre's name is a federally protectable mark because it is capable of distinguishing the Louvre's goods and services from those of others. The word "Louvre" is inherently distinctive. It has no common usage in American English or in French other than to

refer to the Louvre. The mark is arbitrary or fanciful with respect to the nature of the goods and services offered by the Louvre.

125. The Louvre's name is a distinctive and famous mark because it is widely recognized by the consuming public of the United States, including in Illinois, as a designation of the source of the goods and services of the Louvre, specifically the museum or the palace complex in which the museum resides, and with the Louvre's art, exhibits, and merchandise.

126. The Louvre uses its mark in commerce in connection with the distribution, sale, offering for sale, or advertising of goods across the United States, including in Illinois and Minnesota, through, *inter alia*, the Louvre's official website, its online boutique, its collaborations with licensed retailers like Uniqlo, and its collaborations with or the loan of art to U.S. art museums.

127. Without any consent from the Louvre, SEE Global has used various reproductions, copies, or colorable imitations of the Louvre's name in relation to the Louvre Fantastique venture. These reproductions, copies, or colorable imitations are likely to cause confusion, mistake, or deception among consumers as to the source, origin, or sponsorship of the Louvre Fantastique venture, and to falsely mislead consumers into believing that the goods and services of the Louvre Fantastique venture originate from, are affiliated with, are connected with, or are approved by the Louvre.

128.     The Louvre Fantastique exhibition and the Louvre's exhibits, merchandise, and other commerce are of the kind the public might very well attribute to a single source.

129.     SEE Global and the Louvre use the same channels of commerce and target the same general audience – art lovers and those wishing to enjoy the world's finest art collection.

130.     The Louvre offers its museum services to the public at large – and offers them at prices affordable to the general public, rather than only to sophisticated consumers.  And because the Louvre and its marks are so distinctive – referring only to the museum – consumers are more likely to rely on the "Louvre" name without further investigation.

131.     SEE Global had notice of the Louvre's mark at the time of its unlawful and improper actions.  SEE Global acted in bad faith, making no meaningful attempt to disclaim any relationship between the Louvre Fantastique exhibition and the Louvre.  SEE Global acted with the intent to trade on the goodwill associated with the "Louvre" mark and to cause substantial and irreparable injury to the Louvre.

132.     SEE Global profited from these acts of false designation, which have caused the Louvre to sustain monetary damage, loss, and injury in an amount to be determined at trial.

133.     SEE Global's actions have caused substantial and irreparable damage and injury to the Louvre, in particular to its valuable goodwill and the distinctive quality of its name, and, unless enjoined by this Court, will continue to cause substantial and irreparable damage and injury to the Louvre for which the Louvre has no adequate remedy at law.

## COUNT EIGHT
### Federal Copyright Infringement
### (17 U.S.C. §§ 104(b)(4), 106, 501-502, 504)

134.     All foregoing paragraphs are incorporated herein by reference.

135.     The Louvre Website Video, a looping video montage, appears on the homepage of the Louvre's website, www.louvre.fr/en.  The Louvre Website Video consists of footage that was

co-produced by the Louvre and Japanese public broadcaster Nippon Hōsō Kyōkai ("NHK"), pursuant to contracts entered in 2016 and 2017.

136.    Pursuant to those contracts with NHK, the Louvre has full rights to use and display the Louvre Website Video on its website.

137.    The Louvre Website Video is wholly original.

138.    The Louvre and NHK are jointly the exclusive owners of all rights, title, and interest in the Louvre Website Video, including all rights in copyright under French law.  The Louvre has the exclusive right to use the Louvre Website Video in France.

139.    The Louvre Website Video contains only copyrighted material.

140.    The Louvre Website Video was first published in France, on the Louvre's website.

141.    France is a treaty party within the meaning of 17 U.S.C. § 104(b)(4).

142.    The Louvre has published, distributed, and displayed the Louvre Website Video on the homepage of its official website, https://www.louvre.fr/en, since March 2021.  This publication, distribution, and display has been a tremendous success to the Louvre's website since then.

143.    The Louvre Website Video is of significant value to the Louvre because it provides a visually compelling introduction to the museum and highlights two of the most significant works in its vast collection.

144.    All public depictions of the Louvre Website Video are accompanied by an appropriate copyright notice indicating that the Louvre and NHK are the owner of all rights in the work.  Specifically, the Louvre's website notifies visitors that the "texts, images, photographs, audio recordings and audiovisual and multimedia documents" on the website are the property of

the Louvre, and it identifies the Louvre Website Video as deriving from a co-production of the Louvre and NHK.

145.     SEE Global had access to the Louvre Website Video on the homepage of the Louvre's publicly accessible website.

146.     SEE Global has reproduced copies of the Louvre Website Video, with trivial alterations, and used them on the homepage of its Louvre Fantastique app.

147.     In the alternative, there is a striking similarity between the Louvre Website Video and the Louvre Fantastique App Video because they (1) depict the same five shots of video footage, (2) of the same subject matter, (3) taken from the same angles, (4) in the same order, (5) with each of the five shots being the same length, and (6) otherwise appear to be identical.  Those similarities make the Louvre Fantastique App Video so similar to the Louvre Website Video that an ordinary reasonable person would conclude that SEE Global unlawfully appropriated the Louvre's protectible expression.

148.     SEE Global's use of the Louvre Website Video is without the Louvre's or NHK's authorization, consent, or knowledge, and without any compensation to the Louvre or to NHK.

149.     Since SEE Global began exploiting the Louvre Website Video, it has continued to use that video on the homepage of its Louvre Fantastique app to promote its Louvre Fantastique exhibition.

150.     On information and belief, SEE Global's identical copying and exploitation of the Louvre Website Video was willful, in disregard of, and with indifference to the Louvre's rights. On further information and belief, SEE Global's intentional infringing conduct was undertaken to reap the creative, artistic, and aesthetic benefit and value associated with the Louvre Website Video, and to further confuse consumers about the provenance or association between Louvre

Fantastique and the Louvre. By failing to obtain the Louvre's authorization to use the Louvre Website Video or to compensate the Louvre for the use, SEE Global has avoided payment of license fees and other financial costs associated with obtaining permission to exploit the Louvre Website Video, as well as the restrictions that the Louvre is entitled to and would place on any such exploitation as conditions for the Louvre's permission, including the right to deny permission altogether.

151. The Louvre has suffered actual damages, and is continuing to be damaged by the unauthorized reproduction, publication, distribution, and public display of its Louvre Website Video on SEE Global's Louvre Fantastique app.

## PRAYER FOR RELIEF

WHEREFORE, judgment should be entered in favor of the Louvre and against SEE Global as follows:

A. Granting a permanent injunction against SEE Global restraining its use of the Louvre's marks, or any reproduction, copy, colorable imitation or confusingly similar variation of the Louvre's marks, without the Louvre's permission;

B. Awarding the Louvre a money judgment reflecting the Louvre's actual damages resulting from SEE Global's unlawful acts set forth herein, in the form of either a reasonable royalty payment for the unauthorized use of the Louvre's marks or SEE Global's profits, plus enhanced profits and damages, as well as punitive damages as allowed by law;

C. At the Louvre's sole discretion, awarding the Louvre statutory damages up to $100,000 for SEE Global's domain name trademark infringement, in lieu of awarding the Louvre actual damages resulting from the same;

34

D.     Awarding the Louvre attorneys' fees, litigation expenses, and other costs incurred

        in bringing this action;

E.     Granting such other and further relief as may be just and proper.

### JURY DEMAND

The Louvre hereby demands a jury trial on all issues triable by a jury.

**MOLOLAMKEN LLP**

Dated:     Chicago, Illinois
           December 1, 2022

        By:   /s/ Benoit Quarmby
             Benoit Quarmby
             Lauren F. Dayton (pro hac vice forthcoming)
             430 Park Avenue
             New York, NY 10022
             (212) 607-8157
             bquarmby@mololamken.com
             ldayton@mololamken.com

             Kenneth E. Notter III
             Thomas Schubert
             300 North LaSalle Street
             Chicago, IL 60654
             (312) 450-6700
             knotter@mololamken.com
             tschubert@mololamken.com

             *Attorneys for Plaintiff*
             *Musée du Louvre*